[No. 20859.  Department Two.  April 4, 1928.]

JOHN P. HEIERTZ, *Appellant,* v. JENNIE VON THRON
*et al., Respondents.*[1]

[1] LIMITATION OF ACTIONS (57)—FRAUD — DISCOVERY — WANT OF
DILIGENCE. An action by a son to set aside the distribution of
his father's estate on the ground of fraud, instituted nineteen
years after becoming of age, is barred by the statute of limita-
tions, where it appears that he could have earlier learned the
fact of his father's death.

Appeal from a judgment of the superior court for
Walla Walla county, Kuykendall, J., entered May 6,
1927, upon findings in favor of the defendants, in an
action for fraud, tried to the court. Affirmed.

*E. L. Casey (John C. Hurspool,* of counsel), for ap-
pellant.

*Sharpstein & Smith,* for respondents.

ASKREN, J.—The plaintiff in this suit was born in
Minnesota in June, 1886, the son of Theodore and
Catherine Heiertz, and christened Peter Heiertz, but
later his name was changed to John P. Heiertz to avoid
confusion with a half brother. Shortly before plain-
tiff's birth his father killed a man and afterwards the
family became estranged, the father going some four
miles distant and taking up his residence with his
(the father's) mother and sister, while plaintiff re-
mained with his mother. A divorce action followed,
the mother obtaining the care of the plaintiff. A few
years later, the father moved to Walla Walla in this
state, bringing with him his mother and sister. Shortly
after they arrived in Walla Walla, the father went to
Belgium, re-married and returned with his bride to

'Reported in 265 Pac. 1080.

Walla Walla. A little later, he purchased two lots and a house,—the property over which the dispute in this case arises. In 1892 the father murdered his second wife and the next day committed suicide.

One Gus Harras, a former employee of the suicide, was appointed administrator. The sole property of the estate was the property just referred to. It had been purchased for the sum of $850 and the assumption of a note of $270. There also stood against the property two other notes, one for $500 in favor of the mother, and one for $100 in favor of the defendant Jennie Von Thron, who at that time was Jennie Donnette. The property was administered upon and funeral debts and expenses of administration in the sum of $291.70 were filed and approved by the court. There being no funds on hand to pay these claims the mother advanced the sum needed.

The administrator, in his petition for distribution and approval of his final account, alleged that the decedent, Theodore Heiertz, father of the plaintiff here, left no heirs, and asked that the estate be distributed to the deceased's mother, Catherine Heiertz. Upon final hearing, the estate was distributed to the deceased's mother in conformity with the prayer of the petition, on September 23, 1893. On September 30, 1893, Catherine Heiertz deeded the property to her daughter, Jennie Donnette, and the mortgages existing against the property were satisfied of record. Jennie Donnette retained title to the property in question, subsequently marrying Charles Von Thron, and they, many years later, made certain conveyances of the property.

The plaintiff, after his father's removal to Walla Walla, continued to live with his mother in Minnesota and was between the ages of five and six years at the time of his father's death, and approximately one year

older at the time of the distribution of his father's estate. He remained there with his mother until he was twenty-two years of age, when they removed to North Dakota, living there until 1920, when they moved to Canada, where the mother died in 1921. In 1926 he came to Walla Walla and visited with his aunt, Jennie Von Thron, defendant. He performed certain services for her, and a dispute arising, he secured the services of an attorney, and filed a labor lien.

Shortly thereafter he began this action, alleging that fraud had been practiced in securing a decree of the court in probate in 1893, distributing the property to Catherine Heiertz, when, as a matter of fact, Catherine Heiertz and her subsequent grantee, Jennie Von Thron, knew of his birth and that he was the sole heir. He also alleged that he had no knowledge of his father's death or the fraud practiced on him until shortly prior to the institution of the suit. Upon hearing, the court held that the facts of the action did not make it one for relief upon the ground of fraud, and also that knowledge of all the facts was imputed to the plaintiff, and should have been discovered long prior to the commencement of the action.

We, do not think it necessary to discuss the facts relative to the claim of fraud. If it be assumed that there was fraud in the matter, there is abundant evidence indicating that knowledge of the father's death and circumstances relative thereto were, or should have been, discovered many years before. In the community in which he lived as a young man were relatives and neighbors who had this knowledge. He lived with his mother, who also knew of it. He testified that his mother never told him much regarding his father. It may be that a child would be satisfied to receive no information from its mother regarding its father, but an adult would hardly be satisfied to know nothing of

the matter. The appellant lived with his mother until he was thirty-five years of age, and it is hard to believe that she never told him anything regarding his father's death. Be that as it may, it further seems incredible to believe that the later murder and suicide of a man who had killed another and been tried for it in the courts of Minnesota would not sufficiently arouse the community in which appellant lived that the information would be gleaned by him at some time before reaching maturity. Not only this, but he was in touch with relatives who had this information. He remained in Canada for five years after his mother's death, and presumably came to Walla Walla upon a visit. His own testimony is to the effect that, after he came to his aunt's home, he saw his father's picture on the wall and it was a matter of comment between them, but that he never asked whether his father was alive or dead until a week or so later, and that he "was not much interested in it."

Such testimony does not seem convincing, for the most natural and almost spontaneous question that a son would ask would be concerning his father's whereabouts if he thought him still alive.

The trial court expressed itself on this point as follows:

"I am convinced that discovery of the facts many years prior to the commencement of the suit would be legally imputed to plaintiff. His father's death was known in the Minnesota community where plaintiff resided for many years. The tragedy accompanying his demise was a subject for newspaper headlines and would naturally arouse discussion in the place of his former abode, more particularly because of the prior homicide for which he was tried. Plaintiff's neighbors and relatives received letters from his mother and sister announcing Theodore's death, and the removal of his body to the Catholic cemetery, and solicited financial aid to defray the expenses of the removal."

[1]  This action was commenced nineteen years after appellant reached his majority, and the time when he learned, or should have learned, the facts concerning his father's death.  The action was begun too late.  *Wickham v. Sprague,* 18 Wash. 466, 51 Pac. 1055; *Davis v. Rogers,* 128 Wash. 231, 222 Pac. 499.

The judgment is affirmed.

FULLERTON, HOLCOMB, MAIN, and MITCHELL, JJ., concur.